# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs December 14, 2011

## IN RE: SIERRA D.M., ET AL.

**Appeal from the Juvenile Court for Johnson City**
**No. 37,923; 37,924     Sharon Green, Judge**

---

**No. E2011-01663-COA-R3-PT-FILED-JANUARY 25, 2012**

---

The State of Tennessee Department of Children's Services ("DCS")[1] filed a petition seeking to terminate the parental rights of Susan M.M. ("Mother") and Mark M. ("Father")[2] to the minor children Sierra D.M. ("Sierra") and Hunter Z.M. ("Hunter") (or collectively "the Children") pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and (g)(3). After a trial, the Juvenile Court[3] entered its order on August 17, 2011 finding and holding, *inter alia*, that clear and convincing evidence existed to terminate Mother's parental rights to the Children under Tenn. Code Ann. §§ 36-1-113(g)(1) and (g)(3), and that clear and convincing evidence existed that the termination of Mother's parental rights was in the Children's best interest. Mother appeals to this Court. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and JOHN W. MCCLARTY, J., joined.

Holly L. Booksh, Johnson City, Tennessee, for the appellant, Susan M.M.

Robert E. Cooper, Jr., Attorney General and Reporter; Bill E. Young, Solicitor General; and Lindsey O. Appiah, Assistant Attorney General, for the appellee, State of Tennessee

---

[1] The Children's guardian ad litem, Russell Kloosterman, filed the petition and was joined by DCS. For purposes of simplicity only, we refer to DCS as the petitioner.

[2] Father surrendered his parental rights to the Children on May 23, 2011. The time to revoke the surrender has passed, and Father did not make an appearance in this appeal.

[3] The case was filed originally in the Juvenile Court for Hamblen County, but later was transferred to the Juvenile Court for Johnson City.

Department of Children's Services.

Russell J. Kloosterman, Johnson City, Tennessee, Guardian Ad Litem.

**OPINION**

**Background**

The Children were brought into State custody in October of 2003 and were adjudicated dependent and neglected. The Children have remained in State custody since that time. Sierra was five years old and Hunter was twenty-two months old when they were taken into State custody. The petition seeking to terminate Mother's parental rights was filed on July 20, 2010. The case was tried over several days in May and July of 2011. At the time of trial Sierra was thirteen years old, and Hunter was nine years old.

Mother testified at trial. In addition to the Children, Mother has two adult children. When asked, Mother admitted that the Juvenile Court judge had explained the definition of abandonment, and the criteria and procedure for terminating parental rights to her "[q]uite a few times."

Mother graduated from ETSU in 2009. Mother has two bachelor's degrees, one in criminal justice and one in sociology. Mother, however, is not working and has not worked since 2005 when she was in school. Mother stated that she "worked at Save-A-Lot Grocery Store for a few months, and then started school, and then I also did some student worker loans on campus." The student work was done through a work-study program at ETSU during July and August of 2005. Mother has not worked since 2005. Prior to 2005, Mother had worked in Morristown through a temporary agency working in a factory.

When asked, Mother admitted that she has not obtained full time employment. When asked what types of jobs her college degrees qualify her for, Mother stated: "There's quite a few. I could become a police officer, a counselor, a therapist, a corrections officer in a prison. There's numerous." When asked where she has looked for work, Mother stated:

> I have, I'm registered with the Career Center. I have my resume posted on-line on a few of the Monster.com, Yahoo Jobs, places like that.... I am also registered with, with the Johnson City Press on-line to receive, if they, if a job that, that meets what I'm looking for, I get emails regarding those.

Mother admitted that she had not tried to obtain employment with the sheriff's department.

Mother also admitted that she had done nothing to look for a job during the three weeks immediately preceding the trial. Mother could not recall looking for work during the four month period preceding the filing of the petition. Mother has college loans of approximately $40,000 that she testified are deferred while she is unemployed.

When asked how she supports herself, Mother stated: "I donate plasma, and I've received help from family members." Mother testified that she smokes about a pack of cigarettes a day. She testified that the cigarettes cost approximately $3 per pack. Mother also admitted that a few months prior to trial she treated her adult daughter by taking her to a country music concert, and that the concert tickets cost around $15 a piece.

Mother claimed that she was involved in a car accident on July 24, 2010, but did not go to the hospital. She explained: "My treatment was delayed because there was problems with, to get confirmation from the witness as to whether the other guy's insurance company would pay. So treatment was delayed. I did go after that was approved. I went to Dr. Sam Messimer, chiropractor." Mother claimed that Dr. Messimer wrote her a note stating that she could not work, but also stated that Dr. Messimer later released her from treatment in November of 2010. Mother also claimed that she received first and second degree burns on her left arm from popping hamburger grease on July 4, 2010, and that she had to keep her arm covered.

Mother admitted that she is healthy. When asked about disabilities she stated: "Other than from the car accident, I sometimes still have, you know, problems with my neck and my back…. From, from that accident, but…."

Mother admitted that she received a settlement from the car accident. When asked why she had not mentioned this money when she was asked about her income, Mother stated: "That settlement was months ago, so that wouldn't be considered income." When asked the amount of the settlement, Mother stated: "I can't remember an exact amount." Mother then was asked the approximate amount of the settlement and Mother stated: "I'm not sure because I had, out of that settlement I had to pay doctor bills." When pressed for an answer, Mother stated: "I can't remember right off…. When things happened, you know, months ago, I can't remember the exact amount or approximate amount." Mother finally admitted that the settlement was over $10,000, but stated that the settlement was less than $20,000.

Mother was ordered in 2004 or 2005 to pay child support of $90 per child for Sierra and Hunter by the Hamblen County Juvenile Court. The Juvenile Court for Johnson City also ordered Mother to pay child support in the same amount in October of 2009 when the case was transferred. Mother testified that she was able to pay this child support

consistently when she was a student at ETSU. Mother testified that between March 20, 2010 and July 20, 2010, the four month period preceding the filing of the petition, she paid "[a]pproximately $20.00" in child support. Mother, however, admitted that she did not give DCS anything for the children between March 20, 2010 and July 20, 2010.

When asked if she had paid any child support for Sierra or Hunter since the petition was filed on July 20, 2010, Mother stated that she had receipts for "[a]dditional gas that I had to put in my vehicle in order to go to Georgia and back home to see Sierra, food that we might eat on our visits with Sierra and with Hunter. Additional things that I had gotten for the kids, you know, for our visits…. And there have been, on one trip to Georgia Sierra needed some socks, and so I bought her socks." Since July 20, 2010 Mother has not given any money or other support to the foster parents for Hunter.

Mother was asked why Sierra and Hunter were removed from her custody in October of 2003. Mother testified:

> Because I was involved with a person at the time, he, and allegations were made against him from my friend's daughter of a sexual manner, and because he was staying at the apartment with the children and I. I assume that they thought it put the children at risk. And unfortunately at that time, you know, I did make some bad decisions and believed him over my friend's daughter. Once it was established that he was guilty of what he was being accused of, I cut all ties.

The Children have had three trial home placements with Mother while they have been in State custody. The first trial home placement occurred in February or March of 2004. The Children were with Mother for approximately one week. Mother testified that the children were returned to DCS custody "[b]ecause I was getting evicted, and they said that Sierra had made a statement about seeing the man that I had been involved with earlier."

The second trial home placement was in June of 2007, and lasted thirty-one days. When Mother was asked why the Children were removed from her custody that time, she stated:

> Because of an incident that happened at Food Lion. Sierra's behavior got out of control. She wanted, she wanted something, and when she was told no, she did have a tantrum, and I now know that I handled it the wrong way at that time. I now know that there are different ways to handle it now…. She started throwing a fit, throwing a temper tantrum, and I started to walk away. I was trying to pay for what I was purchasing, and she plopped down on the floor

and threw her arms around the buggy, scratching her arms and legs, and I couldn't get her out. I had to call a friend to come and help me. So he was able to turn her legs to where I could slide her out from underneath the buggy. He completed my purchase, and I took Sierra and carried her out to the car, trying to get her in her seatbelt in her booster seat. And she kept, kept holding her arms out and I couldn't get her in her seatbelt…. She did end up with a cut lip.

Mother was asked how Sierra wound up with a cut lip and she stated: "I don't know how that happened." During the incident Mother called 911. When asked why she had called 911, Mother stated:

Because I had made numerous phone calls to the case manager in Morristown. This happened, this happened on a Saturday. I had made numerous calls to the caseworker to, to try to get some advice or assistance. I had also made phone calls to my attorney at the time in Morristown and the guardian ad litem in Morristown and wasn't able to get a hold of anyone.

Mother denied that the cut lip and scratched legs that Sierra sustained from the incident were the result of Mother's actions. Mother testified that Sierra lies a lot.

The third and final trial home placement was in March of 2009. Mother was asked if she was given any instructions by the Juvenile Court prior to that visit and she stated: "No physical restraints, no corporal punishment." The Children were in Mother's custody thirty-one days, and then were removed according to Mother because "Sierra was throwing another temper tantrum, and she made allegations that I 'child abused her.'" Mother was asked what actions led to that allegation and she testified:

The actions that contributed to that was that I had placed her in her room, and was sitting at the door. When I came out of the room, she was laying on her back, kicking the door, trying to, until I put my foot up against (Inaudible) and at one point she hit and kicked and slapped me approximately 30 times. At that point I spanked her on the bottom.

Mother was asked what else occurred and she stated:

During the time that she was throwing a fit, I was on the phone with the in home service worker, trying to get some kind of assistance. I was able, and at that point Sierra had calmed down, and then when my dad got there, she crawled up under Hunter's bed. He was able to, he just talked to her to get her

-5-

out from under the bed.

Mother admitted that the incident involved a power struggle over a Lego. Mother stated: "I was in the process of trying to get the kids to go to bed and there was some defiance there and yes, but since that time, you know, I have, I know that there are other ways that it could have been handled."

Mother was asked what she has done since that time to demonstrate that she can effectively use appropriate discipline techniques, and she stated:

> I graduated from ETSU, and the last two semesters that I was in school, I took some classes that would help me with the children. Child psychology and adolescent psychology, and through those classes I had learned other techniques, or others [sic] avenues to handle those types of situations. I have also been in individual therapy for over a year. I was still participating in that with Sierra while she was at Inner Harbor. Our communication has, we are able to talk more openly, and I have a better understanding of, and a better way of communicating with her about any type of problems that may arise.

When asked about the techniques she has learned, Mother stated: "The ones about rewards and consequences, timing myself or even myself taking a time out, and removing myself from situations or something like that, redirecting and, of course, you know, just talking about whatever the problem might be." Mother testified that she has had parenting skills training with counseling "[q]uite a few times" since the children have been in State custody.

Mother was asked about appropriate discipline techniques for the Children, and she stated: "Talking with them about what's causing the situation, offering rewards and giving them consequences, taking things away from them, time out, grounding them." When asked at what age corporal punishment would be appropriate, Mother replied: "I am not really sure. I mean, corporal punishment should only be used as the last resort. If then." When Mother was asked what type of corporal punishment would be appropriate, she stated: "A swat on their, you know, their bottom. On their hand." When Mother was asked when it would be appropriate to use corporal punishment as opposed to other disciplinary techniques, Mother stated: "I would think if the other things didn't work. Like I said, as a last resort if offering rewards or taking away privileges or sending them to their room or things like that didn't work, then as a very last resort." Mother admitted that she probably recently has used corporal punishment on her two year old granddaughter by slapping the child's hand. When asked if she had tried other remedies before resorting to this punishment, Mother stated: "I can't recall."

Mother testified that she never has been faced with a situation when she would need to use corporal punishment on Hunter. When asked about corporal punishment with regard to Sierra, Mother stated that "a lot has changed since corporal punishment was last thought of with, in regards to Sierra. And I have learned different ways of handling things when the children would not do as they were asked to do. I have learned different ways to handle that." When Mother was asked if she could perceive a time when corporal punishment would be appropriate on Sierra, Mother stated: "No, not right now because like I said, I, you know, I know there are other ways that we can communicate and work through things, but I don't foresee anything like that coming up."

Mother admitted that during the trial home placements Sierra became defiant, acted out, and had temper tantrums. Mother was asked if she had seen any of these behaviors since Sierra has been at the placement center and she stated: "I haven't seen any of these behaviors personally. I have learned about issues that have happened at the center when I am not around, but I have never, never seen any of these personally."

Mother testified that she visits with Hunter every week, and with Sierra every two weeks. Mother was asked if Hunter has been having behavioral issues, and she testified:

> He has been having some over the past few weeks where he was, at one point he had taken some matches from a place at the apartment, and apparently he was striking the matches at the foster home, and burned a few places in her carpet. Yeah, and then one incident where he had turned the stove on and put some napkins in it or something and caused a small fire. And I talked with him about that, and I suggested that, and I told Amy that, I talked with Hunter about this and how detrimental a fire [c]an be, and I suggested that maybe I could call the Fire Department to see if they had some type of educational videos that were, you know, graphic in order to get Hunter to understand just how devastating a fire can be. And I am still waiting to hear back from them on that. I've called.

Sierra now is receiving individual therapy from Alicia Hatcher. Sierra had been receiving therapy from Jason Stevens. When asked, Mother admitted that she had a role in Sierra having to change therapists from Stevens to Hatcher. Mother stated:

> Because I had started to develop feelings for her therapist, Mr. Stevens, and I disclosed them, with Sierra out of the room. So she was not in the room. I let him know about that, and of course, he recused himself or stepped down, and Ms. Hatcher became her therapist again.

Mother was asked if she had asked Sierra to find out if her therapist was married and Mother replied: "I did not ask her to ask him. I just made a comment that I wondered if he had a girlfriend or a wife and she asked him." When asked if she thought it was appropriate to pursue a relationship with Sierra's therapist given Sierra's issues and the fact that Sierra is struggling and hurting, Mother replied: "There was never any pursuing, or, or any, I never acted upon any of those feelings that I had…. I told him that I was, was developing feelings, but as far as acting upon them by opening flirting or making inappropriate comments to him or anything like that, I've never anything like that and nothing."

When asked if any of her own actions have contributed to Sierra's problems or behaviors, Mother stated:

> In the past, there have been some actions, like the last trial home placement, you know, there was a disruption. Yes, I could have handled things a lot differently, and I think that did contribute to her being defiant and throwing temper tantrums. If I would have handled it differently, I am sure that the outcome would have been different.

Mother was asked specifically about her own actions that may have contributed to Sierra's temper tantrum during the last trial home placement, and she stated: "Probably my unwillingness to cooperate, to compromise because, and not knowing the proper way to, we could have talked things out instead of, you know, that blown up portion that we did."

Mother testified that the multiple parenting classes and counseling that she has received have not been effective for her. Mother believes that the adolescent psychology class that she took at ETSU was more effective

> [b]ecause during that, during that class, I was actually able to remember things that were, what I had gone through when I was her age and into puberty, you know, being 15, a teenager, you know. I was able to remember. And I understand a little bit more of what Sierra was going through.

The Children had therapy together in the past, but there were issues with Sierra being aggressive toward Hunter. Mother addressed these issues by telling Sierra that Hunter was younger and smaller than her "and, you know, that she wouldn't like it and everything, you know, if he did it to her, or someone did it to her." When asked if this was effective, Mother replied: "No, I don't think." Mother admitted that Sierra and Hunter have a bad relationship with one another.

Mother admitted that Sierra has some major problems including violence and

sexual acting out.  When asked about the cause of Sierra's acting out, Mother stated:

> behaviorally, or, in my opinion is that there, here are numerous things that contribute to her acting out.  Being in foster care for over seven years.  She's also going through puberty and had to go through a lot of changes.  I think that, and you know, it's, it's a confusing time for her.

Mother was asked to compare how she would handle things now if the Children were returned to her versus how she handled things in the past, and she stated:

> When they were removed from the, from the trial home pass I didn't really know a lot of different ways to handle difficult scenarios such as Sierra getting up in the morning to get ready for school or things like that and now I do, I do know those, you know, I mean, I have learned other ways of handling.

Mother was asked how she would get Sierra up in the morning now, and she stated:

> Try to get her up.  If, if it was sort of a problem with any, you know, with her getting up in the mornings to go to school, you know, she would go to bed earlier the next, you know, the next night.  Taking away, maybe offer her a reward and everything that, you know, we would sit down and discuss, you know, and find out something that she would really, really like to do or something that she would like that she could work towards and maybe discuss with her about, you know, if, if, if you didn't start getting up in the mornings and doing your morning routine and getting things together and getting to school on time on a regular basis and everything, then maybe on the weekend we can do this or something.  Have, you know, short term, not really short term, things that she could look forward to on the weekend and everything if she got up and went to school.

Mother was asked how she had handled such situations in the past, and she stated:

> Back then I was trying to get her up out of bed.  She refused to get up and I started taking away things, a lot of, you know, different things that she had like she's got an alarm clock and a digital, and she's got a camera and her cell phone and a lot of different things so I remember one time she had probably lost maybe about ten things and it didn't help.  She was still refusing to get up.

When it was pointed out that the techniques that Mother claimed she would use now were the same ones that she had used unsuccessfully in the past, Mother stated: "A lot has changed with Sierra, too. She has gotten older and things that she's learned on how to handle, handle things in her therapy along with things that I've learned I think both of us combined would be much better."

Mother has been in individual therapy since August of 2009. Mother's therapist is Polly Yarling. Mother was asked what types of things she has identified during therapy with regard to her own actions that may have contributed to Sierra's behaviors and Mother stated: "I can't recall." Mother testified that she has had two psychological evaluations, one done in 2002 and one in 2006. When asked what the diagnoses of the evaluations were Mother stated: "I can't remember. I don't have that with me." Mother admitted that she has a copy of the 2002 evaluation, but stated that she did not provide a copy of the evaluation to her current therapist and could not recall if she had provided a copy to any of her past therapists. Mother could not recall discussing the 2002 evaluation with her therapist. She stated: "This is before the children were brought into custody and before the incident between Sierra and [Sierra's older sister]. So I didn't feel that it was relevant." Mother did provide her therapist with a copy of the more recent evaluation, but could not remember discussing it with the therapist.

Mother participated in two parenting assessments done by Compass Care Alliance in the year prior to trial. The first of those assessments never was completed and Mother testified this was because the person conducting the assessment left the employment of Compass Care Alliance. Dr. Angelopoulos completed the second parenting assessment. Mother read from Dr. Angelopoulos's parenting assessment and testified that it made recommendations such as:

> Completing anger management program. Participate in all recommended metal health treatment if indicated via an intake process with a qualified mental health professional. Parent training sessions including an ongoing group designed to provide support and strengthen newly developed skills. Obtain and maintain full time employment. Spend time focused and directed time with Hunter in order to facilitate a proper bond between them and participate with behavior analyst or other qualified individual in behavior management skills to lean to better handle Sierra's specific, special behavioral health needs. Indicates that it may benefit for parenting education and number 8 is specialized assessment regarding her sexual beliefs and behaviors as it relates to the children.

Mother testified that she has addressed "quite a few of these." Mother testified that she

-10-

completed an anger management program in the past, but has not completed one since the parenting assessment was done. When asked if she thought that she has an anger management problem, Mother stated: "No." When asked if she was paranoid, Mother stated: "No, I'm not paranoid except, depending on the situation. I wouldn't say it was paranoia."

Polly Yarling is a licensed clinical social worker whom the parties stipulated is an expert in the field of child and family development, and family therapy. Ms. Yarling had treated Mother since August of 2009. She sees Mother for individual therapy every two weeks and, at the time of trial, had seen Mother a total of forty-one times. Ms. Yarling diagnosed Mother with a personality disorder not otherwise specified with narcissistic traits. Ms. Yarling diagnosed that Mother is functioning at a moderate level in her daily life. Ms. Yarling testified that personality disorders are "pervasive and, and they're pretty much always there with somebody." She further stated that such a disorder rarely changes, and "[l]ike only in 5% of the cases." Ms. Yarling testified that Mother has been making "[m]inimal progress" in therapy.

Ms. Yarling testified that Mother provided her with a copy of the evaluation done on Mother in 2006, but refused to provide Ms. Yarling with one the done in 2002. Ms. Yarling stated:

> I asked her for the evaluations on September 30th of '09 and she told me that 2002 isn't relevant to the case because it pertains to the custody of her older daughter. She told me she would bring the 2006, which she did at the next session. I asked her again about the 2002 eval and she said it was none of their business.

Ms. Yarling testified that it would have been helpful in her diagnosis and treatment of Mother to have the 2002 evaluation.

Ms. Yarling testified that the goal of Mother's therapy "has been to address the stipulations that were listed in essence for her to get her children back, so we were addressing her history of, her role in the placement, the disruptions, communication within the family, parenting." When asked if Mother had made progress toward the goal, Ms. Yarling stated: "According to what [Mother] tells me I feel that there has been some progress towards those goals." Ms. Yarling stated, however, that she does not see Mother with the Children, and must rely upon what Mother reports about how she is handling situations. Ms. Yarling has some concerns about whether Mother is being completely truthful in her reports,

> based on [Mother's] diagnosis because it would be consistent with her diagnosis to maybe have some insight but not be able to actually put it into

practice and then I also had some concerns because outside of therapy I've heard from talking to other people that are involved in the case situations that seem to be in contrast to what she's telling me.

Ms. Yarling testified about what Mother related regarding why the Children were in custody stating:

Okay, she told me that on October 29th of '03 that her boyfriend was living with her and that her best friend's fourteen year old daughter, I hope I've got that right, alleged sexual abuse against her boyfriend. She said he was in jail but DCS removed the kids anyway. She said that he plea bargained, but she ended the relationship with him…. And then she told me the first trial home placement was disrupted in March of '04 after one week. She said that Sierra said she saw mom's boyfriend, but [Mother] claimed that he wasn't staying at the house. Let's see. She also mentioned something about Barb Pruitt, a caseworker in Morristown tried to sabotage the case in '06. I'm not exactly sure what the details are on that. At the second trial home placement in June of '07 she said it was disrupted on the 31st day. She said that Sierra threw a tantrum in the store. She clamped her feet on the grocery cart. She said she called her friend Jim to come and help her. He got Sierra out of the cart. [Mother] held her and carried her out to the car. Once in the car Sierra was kicking so [Mother] called the police to get her settled down. The police noticed Sierra's mouth was bleeding and asked mom if she hit Sierra in the mouth. And then the third trial home placement was, let's see, in March of '09 she said on the second day Sierra became oppositional. She mentioned that a Holston in-home worker was supposed to be on call 24/7 and that [Mother] had to call her several times for help. She said later this was used against her. On April 30th she said that there was a safety plan made with the caseworker and spanking was only to be used as a last resort. Apparently there was an argument between Hunter and Sierra. [Mother] carried Sierra because she was kicking the door and then [Mother] spanked her and Sierra bruised and she blamed the bruising on the medication that Sierra was on, Klonopin.

Ms. Yarling was asked if Mother's position with regard to the reasons for custody and the failed home placements has changed since she's been in therapy with Ms. Yarling, and Ms. Yarling testified:

No. There, it's always, she has always pretty much blamed it, you know, on other people. I do have to say out of fairness that at our last session she did bring up the incident at Food Lion…. And now told me that she thought that

it was silly that she made an issue out of that and that she would do things differently, you know, if she had to do it over again…. Which is really the first time that I've ever heard her come close to saying, you know, I might have had a part in this.

When asked if Mother had accepted any responsibility for the Children being in the custody of the State in foster care, Ms. Yarling stated: "No, as far as I remember she's pretty much blamed that on DCS." When asked if Mother had demonstrated any insight into problem areas that contribute to her inability to parent, Ms. Yarling testified:

Minimal, I would say, as far as insight into sort of her personality and how she approaches things. I have seen a little bit more humility. She seems to have maybe softened a little bit, not as abrasive as she was when she first started seeing me. Not as quick to jump, I should say she probably still has the tendency to jump, but is doing a little better at managing her, her reactions.

Ms. Yarling was asked for her opinion regarding Mother's ability to parent the Children in stressful situations, and she testified:

I do have concerns about that. Just based on some things that I've heard other people tell me that [Mother] hasn't particularly shared that, those incidents with me. I have concerns that the changes that she's made are so new and fresh that, and she's only implementing them on, say a weekly or biweekly basis when she's visiting with the kids. I have concerns about whether or not she would be able to maintain that, if the kids come home and they were with her all the time.

When asked if she had observed anything recently that gave her concern about Mother's ability to parent, Ms. Yarling stated:

I observed in the sense of hearing, she was on a phone call with me when her granddaughter was, she and her, her daughter and her granddaughter were staying with her for a couple of weeks and I was talking with her on the phone and I could hear a little one in the background and at one point [Mother] just kind of sharply rebuked her, you know, in terms of get away from my computer, kind of real harsh like that. And then shortly after that she came to see me and she mentioned that the, she wasn't getting much sleep because the granddaughter wasn't sleeping, being out of her own environment and she told me that she mentioned to her daughter we just need to get in the car and, and go away from housing so nobody can hear us so that we can spank her and

make her go to sleep. And I thought that that was kind of over the edge as far as what you would do to get a two year old to go to sleep.

This phone call occurred just a few months before the trial.

Lamont Douglas is a child and youth therapist employed by Frontier Health whom the parties stipulated as an expert in counseling and child therapy. Mr. Douglas has worked with both Children. At the time of trial, Mr. Douglas was working with Hunter. Mr. Douglas had not worked with Sierra since she went into a residential program, approximately one year earlier.

Mr. Douglas was asked why the Children were in therapy with him. He testified it was because they were in foster care and had "[a] lot of issues related to anger, anger outbursts, especially toward each other. Also some inappropriate sexual contact between the two children that had been observed by some of the foster parents …." Mr. Douglas testified that Hunter and Sierra have one of the worst sibling relationships that he has ever worked with.

With regard to therapy prior to Sierra being moved, Mr. Douglas stated:

In sessions I was able to engage them in some play therapy, game therapy. We were actually getting to the point of where we had a fairly civilized concourse without either one of them trying to go across the table towards each other, which was actually significant because for awhile there they would almost, invariably if you put them together more than five or ten minutes and they were almost at each other's throats so that, we were starting to make some progress towards that. Of course that also required a lot of prompting and a lot of intervening with the therapist during that, but that was a significant improvement. And that was starting to happen right before she went into the residential…. We were beginning to get some progress. I wouldn't say that they had really made significant, but we were starting to get a little bit of progress.

Mr. Douglas testified that Hunter has expressed a fear of Mother. Sierra also had expressed to Mr. Douglas a fear of Mother. Mr. Douglas testified that Hunter also is afraid of Sierra. Mr. Douglas testified:

There was a lot of physical altercations between the two of them [Sierra and Hunter]. A lot of physical violence between the two of them, not just the typical fighting, which we typically have. I mean, when they were in foster

-14-

care, the same foster care house, I mean it was almost knock out drag outs, is the way that it was reported to me. So there is a physical component to it. Like I said, there was some indications previously of some either sexual reactivity or sexual acting out, especially with Sierra towards Hunter, so that could possibly also add into, to that.

When asked what Hunter says about Mother, Mr. Douglas testified:

Typically very vague. I'm looking for some recent examples. Like the last time I saw him was on 6/30 and he indicated that he had gone fishing with his mother. He says that he didn't enjoy himself at that time. When asked why he didn't enjoy himself he would not say, but 6/22 he was asked just how he felt about how things were going with mom and he refused to answer and continued to change the subject any time that was asked. I was just asking him for feeling, not asking him for specifics or anything of that nature. 6/16 I saw him and he stated he had talked with mother recently and was wanting to visit her, but not live with her. He stated that he could no longer be around his sister at all and when asked why he felt he did not want to live with his mother he would not answer and would change the subject every time, and that's pretty typical. He'll give a tiny little blurb here and there, but most of the time after that he shuts down pretty quickly and he will not continue on and like I said, I'm not asking for specifics, just trying to get feelings, just trying to do that and that's something that he's typically made sure that he does not share or, or backs away from as soon as he does say something.… I can go through all of these, but that's very, very common. I was looking back a little bit further because there's a different focus on those. On 3/2, this is a note, I think that stated that he had gotten some good, or got some rewards for some behavior choices that he had done in school. He felt as though his foster mother was very proud of him and knowing that was good for him. Was asked about biological mother. He didn't say anything, was accepted. He was glad she was all right, but did not want to live with her. On 2/24 he made the statement, he stated that he does not, that he wants to see his biological mother sometimes, but not trust or feel safe with her. Would not say why he did not feel safe with his biological mother.

Hunter has been diagnosed with ADHD and is oppositional defiant. Mr. Douglas testified that parenting him will take a lot of work and stated:

a lot of outside support to be able to really help with that, especially with the behavior that we've seen and especially with some of the safety issues that

-15-

we've seen with Hunter, with the potential of violence that he's had previously and then also with the fire setting recent, most recently.

When asked if there was a possible correlation between Hunter acting out and his visits with Mother, Mr. Douglas testified: "It did seem to have a, a correlation between more of his defiant behavior and more of the fire setting after the visits then, or within a day or two of the visits."

When asked his opinion about reuniting Hunter and Mother, Mr. Douglas testified:

No, if he were to start out with the therapy with mom and that were really being effective and then really building up the trust and getting the fear out of what's, whatever his fear is. Like I said, I don't know, he has never really expressed it. Never really has told me what it is but has mentioned it several times, so I'm not sure what, like I said, I don't know if that's something that is based on more fact or based on just his perception, but either way until we get to that and can get past that, him being able to trust again is going to be very difficult, especially with his mom…. He's still afraid, yeah, and that's key. He's still afraid. And that potentially has the danger of coming out in anger or coming out in other different things and especially with like the safety issues we've seen…. I would really fear that he would possibly do something based on, like I said, that fear. Whether or not it be real or imagined, it doesn't matter.

Mr. Douglas testified that Hunter has been in his current foster home for "at least a year and a half, two years." When asked how Hunter is doing there, Mr. Douglas testified:

He does very well with her. He has, he respects her. At different times he has said to me, said to the foster mother in front of me that he wanted her to adopt him and wanted, and calls her mom in front of me and often times I have clarified with him who is talking about…. I think he feels, feels secure there. I think as much as he can at this point. The reason I say that, I think there's, any time there's this ambiguity of what will happen, where he's going to be, what may happen, who is he going to be with, then that's going to affect any child when you have those questions, when they want to know where am I going to be next school year? Where am I going to be next week? Where am I going to be, all of these different questions. But taking that into account I would say he is doing very well.

Mr. Douglas testified that Hunter has asked the foster mother in Mr. Douglas's presence when she is going to adopt him.

When asked if it would be better for Hunter to have a permanent home sooner rather than later, Mr. Douglas testified:

> Absolutely. Absolutely, because I think that would help him stabilize and really get over a lot of these other issues that I'm trying to work with him on. A lot of these issues keep coming up and one of the reasons why I still see him for the most part weekly is because of that uncertainty. And I put that as one of the driving factors and there's not much that I can do therapeutically except try and give him some more coping skills and reassurance until we can actually get something that's permanently set by DCS and the Court.

Amy Evans is a child and family specialist, or case manager, with Holston Home for Children. Ms. Evans began supervising visitations in this case in October of 2010. She supervised one visit with Sierra on Thanksgiving Day, but her primary focus is Hunter because he is placed with her agency. Ms. Evans testified:

> Generally the visits go well. I mean there are a few instances where the visit could have gone better, but in general the visits have been going well. [Mother] for the most part is appropriate with Hunter. They're affectionate with one another. We've done some work on talking about inappropriate things in front of Hunter and that has gotten better. I, I know last time I testified in Court I had mentioned that [Mother] has lost her temper in several visits. That's improved mostly, but there have still been a couple of instances where she has kind of snapped at Hunter and one instance in a visit where we were at Fun Expedition and she snapped at him and he got his feelings hurt and he went and hid from us, which I think is, I was, I was concerned with it.

Ms. Evans further testified:

> [Mother], especially when I sort of first took over and throughout the spring of last year she would talk about maybe sexually inappropriate things in front of Hunter that I, I thought, and not necessarily like her own exploits, but did mention a few things in front of him that I probably would have kept from an eight year child, and, and just, it, when Hunter's behaviors are a little bit more challenging I think she has kind of trouble maintaining in visits.… Holding onto her own temper. Well, probably not temper, but she gets more frustrated, which is, I mean, which is understandable in a lot of situations, but it, [Mother]

does well with having like activities and food and she has often used rewards, but, and it seems like she does that a lot better when Hunter is very calm, but when he's kind of acting out it's almost like she forgets to, to use those tools that she has developed.…  She gets flustered and will yell at him or say, you know, things repeatedly instead of, you know, sit down, sit down, sit down, sit down instead of, you know, if you sit down then we'll be able to do this, but she is, she is good at, you know, the beginning of the visit she'll say, well, I've got this special treat, but she doesn't always say I have this special treat, so it's kind of inconsistent, if that makes sense.

Ms. Evans was asked what kinds of things trigger Mother's frustrations, and she stated:

we have kind of a power struggle over eating sometimes, which with an eight or nine year old you would kind of expect.  He would rather play a video game than eat his dinner.  When he doesn't sit still and he, you know, wanders in the other room, that sort of thing, she gets frustrated.

Ms. Evans testified: "I have seen her snap at him several times and I've seen her cuss in front of him, but not necessarily to him, which I think is good."

Ms. Evans testified:

[Mother] did say in a visit at one point that she had to spank her [granddaughter] and she didn't necessarily say it in that, well, she said bust her the slang word for bottom.…  Bust her ass is what she said, in the visit while we were sitting at a table with Hunter present.

With regard specifically to inappropriate comments made in front of Hunter, Ms. Evans testified:

There was a visit where we were eating chicken fingers for, for a snack and she proceeded to tell me a long story about how she had found a chicken finger in one of her packages of frozen chicken fingers that looked like a penis and she took pictures of it and put it on the Internet and, or on her Twitter account I think she said.  Not necessarily the Internet and, and all of this in front of Hunter and Hunter became interested in what she was, in the subject matter. There was an incident where she had talked about going to meet a, or going to see a county music star and she met him and she asked him if it was okay if she molested him a little bit and then she grabbed his butt and she said this in

-18-

front of Hunter, .... She has shown me pictures of a man's hind end that she took pictures of in front of Hunter.

Lisa Shifflett, Director of Family Services at Holston Home for Children, testified at trial. Beginning in August of 2010, Ms. Shifflett began doing family therapy with Mother and Hunter. Ms. Shifflett did about four months of therapy with Mother and Hunter. Ms. Shifflett explained that the therapy was scheduled for every other week, and that they met about eight times in total.

Ms. Shifflett testified about the therapy stating:

Initially we had set a goal of discussing [Mother's] role with Hunter and what brought the children into care as well as why they have remained in care for so long. During the sessions we did activities and facilitated discussions and just different things to try to help them process that together and it was my understanding from DCS and from other recommendations that that was the focus of what our treatment needed to be at that point, so through all of that we ended up terminating, I want to say it was December or January. No, the end of December, beginning of January ... 2010.... And the primary reason for that was that we weren't able to meet the goal that we had originally set. There was not an accountability of [Mother] accepting her responsibility and the role of why the kids came in or why they remained in and without that it was, I was unable to help Hunter and her process together those events because of that, so ....

When asked if the goal of the therapy was explained to Mother and what her response was, Ms. Shifflett stated:

The response in general in the beginning and then throughout was usually a justification or, I mean a reason why the kids were brought in, but not her role in it, if that makes sense. There wasn't, she wasn't at a point, I don't think, individually to be able to take responsibility or accept her role, so ....

Ms. Shifflett usually met with Mother and Hunter together, but there were times when Ms. Shifflett met with Mother alone. Ms. Shifflett testified that Mother primarily blamed DCS and the court system for the children coming into custody.

Ms. Shifflett described a session when Mother became upset stating:

We had done an activity where they were identifying things for different

feelings and [Mother] had identified, it was either angry or sad when DCS had taken the kids away from her and that sparked a conversation because at that point Hunter started asking questions and it never dawned on me until then because he didn't realize he had been taken away from her. He always had his first set of foster parents in his mind as far as who he, who he had been taken away from. That's where his earliest memories are at, so, and I think as any mother, I mean, [Mother] was upset by that because Hunter had that confusion as to who his actual mother was, so …. Well, he has always called her mom but he didn't realize as far as biological mom and that's who he was born to and taken away from. He didn't realize that and I, well, it's as simple as that.

Ms. Shifflett testified: "I guess from a clinical standpoint my biggest concern is that if there's no accountability or acceptance of the responsibility of her role of what brought the children in or have kept them in this long, then there's just a significantly higher risk of those same things reoccurring again." Ms. Shifflett did not think that it was in Hunter's best interest to be returned to Mother's custody in the near future.

Alisa Hatcher is a lead therapist at Youth Villages, Inner Harbor. Ms. Hatcher has been Sierra's therapist since Sierra was moved to Youth Villages in the summer of 2010, with the exception of a brief period during the fall when Sierra saw another therapist. Ms. Hatcher testified:

Sierra is here because she has trouble with behavioral concerns regarding aggression, primarily with aggression. She has had several different issues along the way that have also been part of that issue. Aggression towards others. She has had some issues with self harming in the past. That hasn't been something that we have seen her with recently. Aggression to others has primarily been one of the issues she has dealt with throughout her entire treatment since last summer. Dealing with how she handles authority figures is a large part of her treatment. Acceptance of responsibility for her part in conflicts, those kind of issues, primarily being at 5th level of care, just the intensity of our residential treatment center is due to the level of aggression that she has displayed.

Sierra has been diagnosed with bipolar disorder, attention deficit hyperactivity disorder, and oppositional defiant disorder, among other things. Ms. Hatcher testified that Sierra is functioning at a fairly low level and stated:

You would expect to see someone at her age much higher and that is in large part due to the amount of aggression and conflict in her interaction with adults

-20-

as well as with peers of her own age and her ability in, in the school environment for a child of her age.

Ms. Hatcher testified:

Overall [Sierra] is compliant with her medications. Occasionally she will have a day and it usually only lasts for a short period but where, when she is asked to do something, morning routines are difficult for her and she will refuse to get out of bed, which is also at a time when she is expected to take her medication. Usually that's the only time that she will refuse them, but it is not about not wanting to take medications. This is about defiance, presentation of herself, but usually turns it around and is able to get, get her meds and move on with her day at this point.… There, there are times where she ends up becoming aggressive. She misses school and play activities because she will continue to refuse to get out of bed.

With regard to the family therapy, Ms. Hatcher testified:

Last summer [Mother] was not here very often at all. I don't recall that we were able to have her here until the fall when Sierra had moved to the Douglas Center and her therapist at that time had worked with them to be able to have [Mother] come to the campus. I recall that we talked on the phone at that, when she first came here. And her, Sierra's responses with [Mother] were very out of routine, what I would expect from a child is very, very guarded, kind of protective about her behavior. Didn't want to say too much, but didn't want to be called out on too much either. And then in the fall [Mother] was here. Jason Stevens was the therapist at the time and he was following her case up until December when Sierra, I believe December is when they started having therapeutic leaves away from the campus, where they were allowed to have some time there. And around that same time, in December time is when her behavior started to escalate significantly. Very conflicted about issues across the board and into the beginning of the year. Once I started working with her again in January [Mother] has been attending therapy consistently since that time every other week. She has been here and Sierra's improvement with family therapy since then has been that she is in the sessions and she is able to attend more of the off campus therapeutic leave that they have. She does still struggle to do that and that's one of the issues that we have been working on there to try to help her responding to limits and being able to accept those types of things because she still tests limits quite frequently.

-21-

Ms. Hatcher testified that they are in the process of trying to help Sierra transition into a foster home and stated:

At this point our recommendation is that [Sierra] goes to a home with no other children because of the sexual behavior problems that Sierra has had in the past, which have been up into this year, in 2011, there have been issues and concerns there with her behaviors that continue to make that something that would not be recommended and it would require extensive safety planning. In addition to the sexual behavior problems that she has displayed she also struggles greatly with peer conflicts and because some of Sierra's behaviors and the thinking patterns that are behind her behaviors are so extensive and have required so much work we really want to have her make a slow transition process where she is working only with adults on accepting responsibility and being able to accept feedback or limits from adults without having to have the influence of other children in the home with her at that point upon leaving here, because that has been something she has struggled with.

Ms. Hatcher does not believe that reuniting Sierra with Mother is in Sierra's best interest. Ms. Hatcher expressed concerns about Sierra's safety if Sierra were returned to Mother. Ms. Hatcher agreed that Sierra needs a very, very strong parent figure, and Ms. Hatcher stated that Mother is not that type of parent "at this time." When asked if she could foresee Mother becoming this type of parent, Ms. Hatcher stated: "No, not without some fairly extensive training for her."

Carolyn L. ("Foster Mother") is Hunter's foster mother and has been for approximately a year and a half. She and her adult son live with Hunter. Foster Mother testified:

Hunter is doing great now. He has a couple of issue we're working on, but when he came to me he was about non-functional.… [H]e never slept, he, he couldn't concentrate. He threw fits and cleaned my house out.… You know, take a dozen eggs and throw them in the floor and throw all my vases on the floor, clothes and scream and curse me and call me all, but I've worked hard, really hard.

When asked how Hunter behaves now, Foster Mother stated: "Oh, he's, he's a sweetheart now. I mean, he has a couple of, a couple of things. A child is a child, you know."

Foster Mother testified that she had a lot of problems with Hunter stealing and lying and at the beginning of the previous school year he had been suspended from school

twice for a total of fifteen days. One of those suspensions was for starting fights on the school bus and cursing at the bus driver.

Foster Mother testified that she is working hard with Hunter and stated: "I think I'm making progress." She further stated: "he has come a long ways, a long ways." Foster Mother testified that she loves Hunter, and stated there is "[n]o doubt in my mind" that he loves her. Foster Mother wants to adopt Hunter.

After the trial, the Trial Court entered its very detailed order on August 17, 2011 finding and holding, *inter alia*:

6. The mother, [Mother], failed to pay a reasonable amount of child support for the children between March 20, 2010 and July 20, 2010, the four months immediately preceding the filing of the Petition;

7. The mother, [Mother], paid a total of $20.00 ($10.00 for each child) in child support between March 20, 2010 and July 20, 2010, the four months immediately preceding the filing of the Petition;

8. The mother, [Mother], was aware of her court-ordered obligation to pay child support;

9. The mother, [Mother], did not provide any other material support for the children to either the foster parents or DCS between March 20, 2010 and July 20, 2010;

10. Although the mother, [Mother], testified that she was in an automobile accident on July 24, 2010, there is no credible evidence that she was injured to the extent that she could not work. Her testimony to the contrary is not credible.

11. Although the mother, [Mother], may have been burned with grease on July 4, 2010, there is no credible evidence that she was injured to the extent that she could not work. Her testimony to the contrary is not credible;

12. There was no credible evidence that the mother was ill, injured or incarcerated between March 20, 2010 and July 20, 2010 which would have prevented her from working;

13. The mother, [Mother], donates plasma and receives financial assistance from her family in order to support herself;

14. The mother smokes a pack of cigarettes per day and, according to her testimony, her cigarettes cost $ 3.00 per pack;

15. The Court computes simple math for 30 days a month at $3.00 per pack and finds that the mother's cigarette smoking costs her approximately $90.00 per month;

16. While the mother had money for cigarettes, she only allocated $20.00 in

child support for the four months between March 20, 2010 and July 20, 2010;

17. The mother did not recall looking for employment during the four months preceding the filing of the Petition;

18. The children have been in the custody of DCS since October 31, 2003, (over seven and one-half years) with the exception of three trial home placements, none of which was successful and the longest of which was approximately five weeks;

19. The Hamblen County Juvenile Court found, by clear and convincing evidence, as evidenced by the certified copy of its Order which was filed as an exhibit in this cause, that the child, [Sierra] was in bed with the mother and her boyfriend, [Scotty H.] when the two adults had sex;

20. The Hamblen County Juvenile Court found, by clear and convincing evidence, as evidenced by the certified copy of its Order which was filed as an exhibit in this cause, that the child, [Sierra] was sexually abused by a half-sister when the half-sister had stuck a Barbie doll arm up Sierra's anus resulting in a an [sic] anal tear;

21. The Hamblen County Juvenile Court found, by clear and convincing evidence, as evidenced by the certified copy of its Order which was filed as an exhibit in this cause, that [Scotty H.] was charged with the sexual battery of a fourteen year old babysitter and, that the mother, [Mother], continued to live with him;

22. The Hamblen County Juvenile Court found, by clear and convincing evidence, as evidenced by the certified copy of its Order which was filed as an exhibit in this cause, that there were previous referrals on the mother's home for lack of supervision of these children and that DCS had provided services;

23. The mother, [Mother], has been in therapy with Polly Yarling, a licensed clinical social worker, since 2009 and has had at least 41 sessions with the therapist;

24. Polly Yarling, as stipulated by all parties, is an expert in the field of family therapy and child development;

25. Polly Yarling's licensure authorizes her to perform psychological evaluations and her review of a diagnosis from a previous evaluation finding that the mother, [Mother], has a personality disorder, not otherwise specified, with narcissistic traits is consistent with her observations of the mother in therapy. In her opinion a personality disorder is a pervasive condition and rarely changes;

26. Since the removal of the children in 2003, there have been instances of physical violence towards the children, particularly Sierra, during the failed trial home placements;

27. The first trial home placement (2004) ended after approximately one week

when the mother was evicted and Sierra made a statement about seeing [Scotty H.], the man the mother had been involved with earlier;

28. During the second trial home placement, the child [Sierra], had a bloody mouth as a result of an incident involving the mother and the child at a grocery store. The incident was the precipitating cause of the termination of the second trial home placement which had begun on June 6, 2007, and ended on July 10, 2007;

29. The third and final trial home placement began on March 31, 2009, and ended on May 1, 2009. The third trial home placement ended as the result of the mother's use of corporal punishment on the child [Sierra], directly contrary to the Order of this Court for her to refrain from inflicting corporal punishment on the child. The mother blamed the child's bruising on the child's medication;

30. The mother's corporal punishment of the child was evidenced by visible hand prints on the child's legs which were caused by the mother;

31. [Mother] has not accepted any responsibility for the removal of the children from her care and custody or the termination of the trial home placements to her therapist over 41 sessions with the exception of one session on June 27, 2011, when she told her therapist that she would handle the incident differently;

32. [Mother] does not show any insight to the children's current situation and she has consistently blamed DCS for the children's conditions;

33. The mother's therapist has concerns about the mother's ability to parent the children. She would not recommend placing the children with their mother within the next six months, possibly within the next year;

34. In the therapist's opinion, [Mother] has made minimal progress in identifying her problems which contribute to the current situation;

35. The mother's therapist overheard [Mother] sharply rebuke a little child in the background to "get away from my computer" when she was speaking to [Mother] on the telephone in April, 2011. The little child was believed to be [Mother's] two year old granddaughter;

36. The mother told her therapist that she was not getting much sleep and that she and the child's mother needed to put the toddler in the car and get away from housing so that no one would hear them spanking the child;

37. The therapist testified that the [Mother's] overall progress in nearly two years of therapy was minimal;

38. The child, [Hunter], has been diagnosed with attention deficit disorder and oppositional defiant disorder by his therapist, Lamont Douglas, who is a child and youth therapist recognized by the Court as an expert in this field.

39. While Lamont Douglas was treating both children, there were anger

outbursts between the children and inappropriate sexual contact between the two children. At one point during the therapy the child, [Hunter], was setting fires in the foster home;

40. [Hunter] does not talk about his mother to his therapist, and when his therapist asks the child about his mother, he just typically shuts down;

41. [Hunter] has consistently told his therapist since 2008 that he does not feel safe with his mother. The therapist could not testify whether the child's fear was based on fact or fiction, but did testify that the child's fear was still a fear. The therapist believes that the child is afraid of his mother;

42. [Hunter] has told his therapist that he would like to see his mother but that he does not want to live with her;

43. Mr. Douglas opined that it would require exceptional parenting skills to parent a child with Hunter's mental health diagnosis and behavior issues;

44. Mr. Douglas testified that the child has repeatedly stated that he wants his foster mother to adopt him. He has asked the foster mother in Mr. Douglas' presence when she was going to adopt him. The child calls his foster mother "Mom;"

45. In Mr. Douglas' opinion, permanency is in Hunter's best interests and when he obtains a permanent home, his condition will most likely stabilize;

46. Mr. Douglas opined that there appeared to be a correlation between Hunter's negative behaviors and visits with his mother, [Mother];

47. [Sierra] disclosed similar concerns about having a fear of her mother to Mr. Douglas when he was treating both children. Sierra made statements to him concerning the physical altercation between her and her mother at the time of the third (and final) trial home placement;

48. In Mr. Douglas' opinion, the two children have a bad sibling relationship, one of the worst sibling relationships he has ever worked with. Hunter is afraid of Sierra. There had been a lot of physical violence between the two children, "almost knock-down drag-outs." There were reports of Sierra sexually acting out toward Hunter in a foster home, resulting in the separation of the children;

49. Mr. Douglas expressed concern if the mother said that she was going to take a child away from possible observation by others for the purpose of spanking the child;

50. The mother, [Mother] had discussed sexually inappropriate topics in front of Hunter last spring, when Hunter was eight years old. She had said, while eating chicken fingers, that she had found one that looked like a penis, that she took a picture of it, and that she put it on her Twitter account. She had said that she met a country music star, asked him if she could molest him a little, and grabbed his butt. She showed the therapeutic supervisor a picture of a

man's bottom. All of these actions occurred in the presence of Hunter;

51. [Mother] acknowledged that she had spanked her two year old granddaughter. Her actual statement was "I busted her ass;"

52. The mother has supervised visitation with the child, Hunter. The therapeutic supervisor provides feedback to the mother and the mother has been responsive on several occasions. During some of the visits, the therapeutic supervisor has to prod to get the child and his mother to interact;

53. [Mother] is usually appropriate with Hunter during the supervised visits and has gotten better about not talking about inappropriate topics;

54. When Hunter's behaviors are a little out of control during a supervised visitation, the mother gets frustrated. She "forgets to use the tools she has learned" to redirect Hunter's behavior. She loses her temper. She gets into a power struggle with the child over eating. She has cursed in front of the child, and has snapped at him.

55. Family therapy between Hunter and his mother occurred bi-weekly for four months beginning in August, 2010. The family therapy was terminated because the mother did not accept responsibility for why the children were in foster care and had no accountability;

56. From a clinical standpoint, according to the family therapist, if there is no accountability by the mother about why the children are not in her custody, there is an increased risk of abuse or neglect of the children occurring again;

57. In the opinion of the family therapist, reunification between the child and mother was not in his best interests;

58. The child, [Sierra] has a diagnosis of bipolar disorder, not otherwise specified; oppositional defiant disorder, and attention deficit hyperactivity disorder. She displays signs of reactive attachment disorder;

59. When Sierra arrived at her residential treatment facility, she was a "very troubled, damaged child;"

60. Although Sierra's behaviors have improved, she still has a long way to go in controlling her behavior and minimizing conflict in challenging adult authority, in her therapist's opinion;

61. When Sierra started having off-campus visitation with her mother in December, 2010, her negative behavior increased;

62. Parenting [Sierra] will be exceptionally challenging;

63. It would not be appropriate to place Sierra in a home with other children, because of her sexual behaviors and because she struggles with significant peer conflict;

64. It is not in Sierra's best interests to be reunited in the home with her mother. Although their rapport is positive, structuring their reunification in a safe setting is her therapist's concern. According to Sierra's therapist, six

months of intense therapy with the mother working on setting limits and providing an environment with rules that are socially appropriate may not be enough time to accomplish this goal;

65.  Sierra's therapist, Ms. Hatcher, opined that the [sic] Sierra will need a very, very strong parental figure and her mother is not that person;

66.  In Sierra's therapist's opinion, the stability of an adoptive home would be ideal for Sierra.  She would not recommend the return of Sierra to her mother;

67.  Sierra has expressed to her therapist mixed feeling[s] about adoption and returning to live with her mother;

68.  In her therapist's opinion, if Sierra's mother was the cause of the abuse in her life and her mother was removed from her life, Sierra would progress;

69.  Despite seven years of individual counseling for the mother and both children, family counseling, psychological assessments, parenting assessments, parenting classes and in-home services, it is likely that in all reasonable probability both of the children would be subjected to further neglect and/or abuse by the mother should they be returned to her care and custody;

70.  Due to the length of time and the extensive services already provided, there is little likelihood that these conditions will be remedied so that the children could be returned to [Mother] in the near future;

71.  The child, [Hunter], is doing well in his foster home, the foster mother testified that "he is a sweetheart now;"

72.  When [Hunter] was placed in the foster home he was about non-functional.  He would not sleep, he had fits, he was disruptive, he cursed, he stole and lied;

73.  The foster mother testified that she would like to adopt Hunter should he become available for adoption;

74.  Hunter has stated numerous times that he wants to be adopted;

75. [Mother] has not made an adjustment of her circumstances, conduct or conditions despite years of assistance by the Department of Children's Services and other providers;

76.  It is unlikely that [Mother] will be able to make an adjustment in her circumstances in the near future;

77.  The only indication that [Mother] is even starting to recognize her role in these circumstances was her testimony that "I could have handled the situations differently." This is an inadequate movement towards an adjustment in conduct and conditions;

78.  There is "some" positive relationship between the mother, [Mother], and the child, [Sierra], according to Sierra's therapist.  Sierra, according to her therapist, views her relationship with her mother as someone she spends time with, but as not who she lives with.  They have not developed the relationship

such that they could live together. The relationship that Sierra and her mother have with each other is not interpreted by the Court to be a meaningful parent-child relationship;

79. There is not a meaningful relationship between the mother [Mother] and the child [Hunter]. Until very recently he did not even realize that he had been removed from her home. When he returns to his foster home from supervised visits with his mother, he clings to his foster mother;

80. [Hunter] is well integrated into his foster home. His behaviors in the foster home and school have improved dramatically over the last year although there have been negative behaviors, too. His foster mother expressed her love for the child. She is very bonded with the child. His foster mother has met the child's educational needs. She is committed to the child. A change in care[-]givers and physical environment would likely have a very negative effect on Hunter's emotional and psychological condition;

81. [Sierra] requires a change in care[-]givers from her residential treatment facility to a safe and structured foster home, due to her no longer needing this intensity of services. She testified that she would like to be moved to a foster home closer to her mother. She testified that she misses her "old" foster mother and wishes she were going there;

82. The testimony of [Mother] was not credible. Whenever pressed on an issue that may be negative to her, [Mother] "could not remember." [Mother] did not remember how Sierra ended up with a bloody lip during the second failed trial home placement. [Mother] could not remember if her therapy included any of her past actions that may have contributed to Sierra's behaviors. [Mother] could not remember if she had a diagnosis from any of her mental health evaluations. [Mother] could not remember anything that was specifically her fault for any of the failed home placements;

83. [Mother] expressed emotional feelings for Sierra's therapist to him, resulting in the necessity for him to withdraw as Sierra's therapist. The Court finds that the requirement to change therapists was detrimental to Sierra's well[-]being;

84. [Mother] has not completed anger management training or counseling as recommended in the parenting assessment;

85. [Mother] stated that she does not have an anger management problem;

86. [Mother] stated that the only reason she is in counseling is that it is a requirement of the permanency plans;

87. Despite having graduated from college in December, 2009, [Mother] is not currently employed and, with the exception of registering with a career center, she has made little effort to obtain employment;

88. [Mother] was employed in the public sector prior to her graduation from

college;

89. A parenting assessment completed by Dr. John [Angelopoulos] found that [Mother] lacked interpersonal skills, presents as accusatory, combative, and paranoid, and has a history of poor decision-making skills. His evaluation assessed her risk of future abuse and neglect as "high;"

90. [Mother] was given prepaid gas cards from the Department of Children's Service[s] to travel to Atlanta to visit with Sierra at the residential placement facility when visits were approved by the Court in the fall of 2010. The residential placement facility always paid for the costs of her motel room to stay overnight.

91. On some occasions, the cost of gasoline exceeded the prepaid gas cards which [Mother] had received from the Department of Children's Services. She presented numerous gas receipts with hand-written notations for the purported purpose of evidencing these purchases. She presented receipts for new tires for her automobile, anti-freeze, a radiator hose, oil and oil change, and windshield blades, which the Court finds are expenses of normal vehicle maintenance. Her visits with Sierra were on alternating weekends and she has presented gas receipts for every day of the week, including receipts for purchases made with the prepaid gas cards. She presented several gas receipts for $10.00 each to go to the Department of Children's Services to pick up her prepaid gas cards. She has presented receipts for attending family therapy with Hunter and to visit with him, even though the family therapy and visits with Hunter were local.

92. The only definitive receipts which the Court can attribute to the mother's alternating weekend trips to Atlanta to visit Sierra (which were not paid by prepaid gas cards and the residential facility for lodging) are for February 17, 2011 ($50.00), February 19, 2011 ($69.42), March 19, 2011 ($6.40 and $23.00), April 9, 2011 ($27.00), and April 23, 2011 ($65.00).

93. [Mother] purchased poker cards ($1.00) on February 3, 2011, Chap Stick ($1.65) on February 18, 2011, nail glue and air brush nails ($2.00) on February 19, 2011, a greeting card ($1.00) on March 18, 2011, 3 pairs of socks on April 9, 2011, and puzzles ($7.00) on April 23, 2011, for her daughter, Sierra. She presented no other receipts or evidence of direct gifts or support to Sierra.

94. [Mother] presented no receipts or evidence of gifts or support to Hunter.

* * *

1. From the exhibits entered into evidence, the testimony of the witnesses and the record as a whole, the Court finds and so rules that the GAL and DCS have proven by clear and convincing evidence that the mother, [Mother] has

abandoned her children, [Sierra] and [Hunter], by willfully failing to pay child support for four consecutive months immediately preceding the filing of the Petition. The Petition to Terminate Parental Rights was filed on July 20, 2010. The proof showed that a total of $20.00 ($10.00 per child) in child support was paid during the period of March 20, 2010, and July 20, 2010, the four consecutive months immediately preceding the filing of the Petition. The Court finds and so rules that $10.00 in child support during a four month period is token support under the circumstances.

2. The proof further showed that the mother, [Mother], is a college graduate, is unemployed, and has done little or nothing to obtain employment since her graduation. [Mother] had worked in the public sector prior to her graduation from college. [Mother] obtained money by selling plasma and received financial support from her family. She is able to spend approximately $90.00 per month on cigarettes, and yet is unable to make even minimal payments for the support of her children. Her testimony that she was unable to work due to a grease burn on July 4, 2010, was not supported by medical evidence and is not credible. [Mother] was aware that she had the obligation of supporting her children, that she had been ordered by the Court to pay child support, and that she was present in Court when child support was set. She had paid child support in the past. She knew the consequences of her failure to pay child support since she was provided copies of the Definition of Abandonment and Criteria and Procedure for Termination of Parental Rights by the Department of Children's Services on several occasions, and since the Court explained the definition to [sic] abandonment to her in the permanency plan hearings several times prior to the filing of the Petition. The Court finds and so holds, therefore, that there is clear and convincing evidence that the mother's failure to pay child support was willful.

3. The Court is, therefore, of the opinion and so holds that the GAL and the DCS have proven, by clear and convincing evidence, the statutory grounds for termination of parental rights as set out in T.C.A. § 36-1-113(g)(1) as defined in T.C.A. § 36-1-102(1[)](A)(i), as to [Mother], by reason of abandonment for willful failure to provide support for the children during the four consecutive months immediately preceding the filing of the petition.

4. From the exhibits entered into evidence, the testimony of the witnesses and the record as a whole, the Court finds and so rules that the GAL and DCS have proven, by clear and convincing evidence, that that [sic] there are conditions that exist that will prevent the safe return of the children to the mother; there is little likelihood that the conditions will be remedied in the near future; and, continuation of the parent and child relationship greatly diminishes the children's chances of early integration into a safe, stable and permanent home.

The children have been in DCS custody for over seven and one-half years. They were removed from the mother's home due to findings of inappropriate conduct on the part of the mother, i.e., permitting the then 5 year old [Sierra] to be present when the mother was having sex with her boyfriend. The Hamblen County Juvenile Court also found that Sierra had been sexually abused by her half-sister. The mother did little or nothing to protect the child from her half-sister. Since that time other conditions have arisen or come to light that prevent the return of the children to the mother's care and custody. The children were placed on a trial home placement which disrupted due to the mother being evicted from her home. The children were placed on a second trial home placement which was disrupted when the mother engaged in a physical altercation with Sierra in a grocery store resulting in the child receiving a bloody mouth. The mother's testimony that she "did not remember" how the child got the bloody mouth is not credible. The third trial home placement disrupted when the mother engaged in corporal punishment of Sierra leaving evidence of hand marks in direct disobedience of the Court's Orders for her to refrain from exercising corporal punishment to the children due to the history of the case. The children's behaviors deteriorated significantly after the end of the last trial home placement. The children engaged in fights and inappropriate sexual conduct to the extent that they had to be placed in separate foster homes. The child [Sierra's] behaviors have resulted in her out of state residential treatment for approximately one year. The child [Hunter's] behaviors included lying, stealing, disruptive behavior, cursing, failure to sleep and fire starting. The mother, [Mother], has never acknowledged, either in therapy or in Court, her role in creating or continuing the situations which have made it necessary for the children to be in foster care, with the exception of a very recent acknowledgment that "she could have handled things differently." The mother's therapist testified that the mother has made minimal progress in therapy over the last two years. Neither the mother's therapist nor either of the children's therapists could recommend the return of either of the children to the mother. Both children have expressed fear of their mother. The parenting assessment by Dr. John Angelopoulos noted that [Mother] lacked interpersonal skills, that she presents as accusatory, combative and paranoid, and that she has a history of poor decision making skills. [Mother] denied any responsibility for the situation concerning her children during the parenting assessment. Dr. Angelopoulos assessed her risk of future abuse and neglect is high due to her level of denial, paranoia and the history of the case. More recently there were two incidents involving [Mother's] two year old granddaughter which serve to confirm the therapists' opinions. [Mother] was overheard telling her daughter that they should take the

toddler away from their apartment to spank her so that no one could hear the spanking. In a separate incident [Mother] reported that she had spanked her two year old granddaughter, except that her terminology was the [sic] she had "busted her ass." Given her recent willingness to use corporal punishment, the fact that two of the trial home placements were terminated due to her using corporal punishment on her children, the fact that she has made minimal progress in her therapy in 41 sessions over a two year period, that she has been assessed had [sic] having a high probability of abusing or neglecting her children, that she has shown no acknowledgment or insight of her role in the reasons that the children are and remain in the State's custody, that the children have expressed fear of her, it is apparent that there has been little positive change in her behavior or mental state and a lasting change, in all reasonable probability is unlikely.

5. [Mother] has graduated from college and is an intelligent woman. She is able to recite appropriate discipline parenting techniques of rewards and consequences and taking away privileges; she is able to recite that corporal punishment "should only be used as a very last resort." She has not, however, evidenced her being able to transfer her academic knowledge of appropriate parenting into "real life" parenting as evidenced by her recent conduct involving her two year old granddaughter.

6. The Court, therefore, finds and so hold that the GAL and DCS have proven by clear and convincing evidence that the children have been removed from the home of their mother for a period of six months; that conditions exist, other than those which resulted in the children's removal, which in all reasonable probability would cause the children to be subjected to further abuse and neglect should they be returned to the mother's care and custody; that these conditions prevent the children's safe return to the mother's care; and that there is little likelihood that these conditions will be remedied at an early date so that the children can be returned to the mother in the near future; and that the continuation of the parent and child relationship greatly diminishes the children's chances of early integration into a safe, stable, and permanent home. The children have been in custody of the Department of Children's Services for over seven years. The mother has been in therapy for almost two years with minimal results. There have been other therapy providers prior to the current provider. The mother has shown a continued propensity to use corporal punishment on children in her care. While she graduated from East Tennessee State University with two degrees over eighteen months ago, she is still unemployed and is making little, if any, effort to become employed. The children will require superior parenting skills to address their mental health problems and behaviors. Although [Mother] can recite academically

appropriate parenting skills, she has not demonstrated parenting skills which would be adequate to parent significantly less challenging children. The Court further finds and so holds that the GAL and DCS have proven by clear and convincing evidence that the continuation of the parent and child relationship greatly diminishes the children's chances of early integration into a safe, stable and permanent home. The children have been in DCS custody for over seven and one-half years. During that time the mother, [Mother], has not made any significant progress on correcting the conditions which resulted in the children remaining in foster care. According to every mental health expert that provided testimony in this matter, there is little likelihood that significant and sufficient progress could be made in the near future. [Hunter] is well integrated into a foster home and the foster parent desires to adopt him. [Sierra] has made significant progress on her behaviors and she is ready to be released from residential placement and placed in an appropriate therapeutic foster home. Any further delays in terminating the parent and child relationship just further delays integration of the children into a safe, stable and permanent home. Therefore the Court finds and so holds that the GAL and DCS have proven by clear and convincing evidence that the conditions required to prove the statutory grounds for termination of parental rights pursuant to T.C.A. § 36-1-113(g)(3) "persistent conditions" have been proven as to [Mother].

\* \* \*

**Best Interests:**
1. The Court has carefully considered each of the statutory factors of "best interests" contained in T.C.A. § 36-1-113(i).
2. The Court finds from the testimony of the witnesses, the exhibits entered into evidence, and the record as a whole that the GAL and DCS have proven by clear and convincing evidence that it is in the best interests of the children that the parental rights of [Mother] be terminated.
3. The Court finds that [Mother] has not made such an adjustment in her circumstance, conduct or conditions as to make it safe and in the children's best interest to be returned to her home. The incident with [Mother's] two year old granddaughter, which she did not deny, gives the Court great concern, specifically considering that the termination of the last two trial home placements were the direct result of [Mother] using inappropriate corporal punishment on Sierra after the Court had specifically prohibited the mother using corporal punishment on the children. The mother's progress in therapy over 41 months has been "minimal". The parenting assessment showed a high risk of abuse and neglect. No mental health professional, including the

-34-

mother's therapist, was able to testify that it was in the children's best interests to be returned to their mother. Wherefore the Court finds and so holds, pursuant to T.C.A. § 36-1-113(i)(1) that the GAL and DCS have proven by clear and convincing evidence that it is in the best interests of [Sierra] and [Hunter] that the parental rights of their mother, [Mother], be terminated for her failure to make such an adjustment of her circumstance, conduct or conditions so that is in the children's best interest to be returned to her home.

4. The Court finds and holds from the testimony of the witnesses, the exhibits entered into evidence and the record as a whole that the GAL and DCS have proven by clear and convincing evidence that it is in the best interests of the children that the parental rights of [Mother] be terminated as she has not made a lasting adjustment after reasonable efforts by DCS for such a duration of time that lasting adjustment does not reasonably appear possible. The children have been in foster care for over seven and one-half years. The Court finds that there has been extensive involvement by the Department of Children's Services and many other mental health and social services agencies. The DCS has provided residential treatment for Sierra for approximately one year. The mother has participated in bi-weekly family therapy with Sierra. The mother has participated in family therapy with Hunter. [Mother], has been in individual therapy for almost two years and yet has made only minimal progress. There has been a parenting assessment by Dr. John [Angelopoulos] with numerous recommendations, including anger management, in which the mother failed to participate. There has been therapeutic visitation services provided between Hunter and his mother. Hunter remains afraid of his mother and appears relieved when the visits are concluded, clinging to his foster mother. There have been three trial home placements, all of which were ultimately terminated. There has been such an extensive set of services provided for such an extended period of time with such little adjustment in the mother's conduct that any las[t]ing adjustment does not reasonably appear possible. The Court finds that DCS has made more than reasonable efforts to attempt to assist the mother and to remedy the reasons that resulted in continued foster care for these children. The Court finds and so holds, pursuant to T.C.A. § 36-1-113(i)(2) that the GAL and DCS have proven by clear and convincing evidence that it is in the best interests of [Sierra] and [Hunter] that the parental rights of their mother, [Mother], be terminated for failure to make such a lasting adjustment after reasonable efforts by DCS, for such a duration of time that a lasting adjustment does not reasonably appear possible.

5. The Court finds and holds from the testimony of the witnesses, the exhibits entered into evidence and the record as a whole that the GAL and DCS have

proven by clear and convincing evidence that it is in the best interests of the children that the parental rights of [Mother] be terminated as she has not established or maintained a meaningful relationship with the children. The children have expressed fear of their mother. Hunter does not talk about his mother other than to show anxiety when he was required to visit with her. He appeared relieved when the visits were over. The individual who is supervising the visitation between Hunter and his mother has to "prod" them during the visits. Sierra has repeatedly suffered physical injuries by her mother in that she had a bloody mouth and visible hand marks and bruises during trial home placements. The perpetrator of the sexual abuse on Sierra (her half-sister) was recently residing with [Mother]. With the exception of the three failed trial home placements, the longest of which was about six weeks, the children have not spent any meaningful time with their mother in over seven years. Hunter did not, until recently, realize that he had been removed from [Mother's] custody. The Court interprets the relationship between Sierra and her mother as not a parent-child relationship but as a diversion from Sierra's residential placement. The Court, therefore, holds, pursuant to T.C.A. § 36-1-113(i)(4) that the GAL and DCS have proven by clear and convincing evidence that it is in the best interests of [Sierra] and [Hunter] that the parental rights of their mother, [Mother], be terminated for her failure to establish or maintain a meaningful relationship with the children.

6. The Court finds and holds from the testimony of the witnesses, the exhibits entered into evidence and the record as a whole that the GAL and DCS have proven by clear and convincing evidence that it is in the best interests of the children that the parental rights of [Mother] be terminated as a change in care[-]givers at this point in their lives would be detrimental to their emotional, psychological and medical conditions. The Court holds that a change of care[-]givers and physical environment would likely have a very negative effect on Hunter's emotional, psychological and medical condition. He is stable, apparently for one of the first times in his life. He is making progress on his behavior. He has a loving relationship with his foster mother. He calls her "Mom." He has asked her when she is going to adopt him. A change in care[-]givers would have a very negative effect on him. Sierra needs a change of care[-]givers and physical environment based upon the testimony of her therapist in that she needs to be able to step down to a very safe and structured foster home at this point. Based on the testimony of the therapists, the mother's recent history of inflicting corporal punishment on her two year old granddaughter and the mother's suggestion of taking the toddler out to physically punish her where no one can hear or observe, the Court finds that the mother, [Mother], in all reasonable probability, will not and cannot provide

the type of safe and stable environment required to meet Sierra's emotional and psychological needs. The Court, therefore, holds, pursuant to T.C.A. § 36-1-113(i)(5) that the GAL and DCS have proven by clear and convincing evidence that it is in the best interests of [Sierra] and [Hunter] that the parental rights of their mother, [Mother], be terminated because a change in care[-]givers to the mother at this point in their lives would be detrimental to the children's emotional and psychological well[-]being.

7. The Court finds and holds from the testimony of the witnesses, the exhibits entered into evidence and the record as a whole that the GAL and DCS have proven by clear and convincing evidence that it is in the best interests of the children that the parental rights of [Mother] be terminated as [Mother's] mental and emotional status will be detrimental to the children and prevents her from effectively parenting the children. The Court finds that the mother's emotional and mental status at this point would be detrimental to the children and would prevent her from effectively providing safe and stable care and supervision for the children. [Mother's] demeanor when testifying, her lack of credibility, and the testimony of the therapists and mental health experts leave little doubt that she has emotional and/or mental issues that prevent her from being an effective parent for these two children, especially when these children need consistent and exceptional parenting skills to meet their needs. Wherefore the Court finds and so rules, pursuant to T.C.A. § 36-1-113(i)(8) that the GAL and DCS have proven by clear and convincing evidence that it is in the best interests of [Sierra] and [Hunter] that the parental rights of their mother, [Mother] be terminated because her emotional and/or mental status would be detrimental to the children and prevent her from effectively providing safe and stable care and supervision for the children.

8. The Court finds and holds from the testimony of the witnesses, the exhibits entered into evidence and the record as a whole that the GAL and DCS have proven by clear and convincing evidence the statutory grounds for termination of parental rights pursuant to T.C.A. § 36-1-113(g)(1), abandonment for willful failure to pay child support; and T.C.A. § 36-1-113(g)(3), persistence of conditions. Further, the Court finds that the GAL and DCS have proven by clear and convincing evidence that it is in the best interests of the children [Sierra] and [Hunter] that the parental rights of [Mother] be terminated pursuant to the provisions of T.C.A. §§ 36-1-113(i)(1), (2), (4), (5) and (8). Therefore the Court finds and so holds that the GAL and DCS have proven by clear and convincing evidence that the conditions for termination of parental rights as set forth in T.C.A. § 36-1-113(c)(1) and (2) have been established in this matter. Therefore, that the parental rights of [Mother] to the children, [Sierra] and [Hunter] be and are terminated.

Mother appeals to this Court the termination of her parental rights.

**Discussion**

Although not stated exactly as such, Mother raises three issues on appeal: 1) whether the Juvenile Court erred in finding and holding that clear and convincing evidence existed to terminate her parental rights to the Children pursuant to Tenn. Code Ann. § 36-1-113(g)(1) for willful failure to provide support; 2) whether the Juvenile Court erred in finding and holding that clear and convincing evidence existed to terminate Mother's parental rights to the Children pursuant to Tenn. Code Ann. § 36-1-113(g)(3) for persistent conditions; and, 3) whether the Juvenile Court erred in finding by clear and convincing evidence that it was in the Children's best interest for Mother's parental rights to be terminated.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

Our Supreme Court reiterated the standard of review for cases involving termination of parental rights, stating:

> This Court must review findings of fact made by the trial court *de novo* upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Upon reviewing a termination of parental rights, this Court's duty, then, is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).

In *Department of Children's Services v. D.G.S.L.*, this Court discussed the

relevant burden of proof in cases involving termination of parental rights stating:

> It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).

> Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c).

*Dep't of Children's Servs. v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 Tenn. App. LEXIS 941, at **16-17 (Tenn. Ct. App. Dec. 28, 2001), *no appl. perm. appeal filed*. Clear and convincing evidence supporting any single ground will justify a termination order. *E.g.*, *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

We first address whether grounds existed to terminate Mother's parental rights to the Children pursuant to Tenn. Code Ann. § 36-1-113 (g)(1) for willful failure to provide support. In pertinent part, Tenn. Code Ann. § 36-1-113 (g) provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113 (g)(1) (2010).  As pertinent to this appeal, Tenn. Code Ann. § 36-1-102 provides:

(1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

* * *

(D) For purposes of this subdivision (1), "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child;….

Tenn. Code Ann. § 36-1-102 (1)(i) (2010).

In her brief on appeal, Mother admits that she was aware of her duty to support the Children and aware that her child support obligation was $180.00 per month.  Mother, however, argues that she made "in excess of $10,000 [in child support payments] over the seven and a half years (7.5) that the children were in DCS custody," and that "[s]he continued to make these child support payments despite lack of stable employment."  Mother has missed the point.

The statute specifically requires that courts consider the relevant four month period "immediately preceding the filing of a proceeding or pleading to terminate the parental rights …," not other periods of time.  Tenn. Code Ann. § 36-1-102(1)(A)(i) (2010). The fact that Mother may have made child support payments at some point in the past is immaterial to the analysis.  The Juvenile Court found by clear and convincing evidence that Mother had paid only $20.00 in child support during the relevant four month period, and further found that this amounted to token support.  The evidence in the record on appeal does not preponderate against these findings.

Mother also argues on appeal that her failure to pay child support was not willful because she was unable to provide support. The Juvenile Court, however, found Mother not to be credible particularly with regard to her testimony about the fact that although she obtained two college degrees she is unable to obtain any employment and unable to work. The Juvenile Court also found that Mother spent, by her own admission, $90.00 per month on cigarettes, and was able to treat her adult daughter to concert tickets, despite her assertions that she was unable to provide support for the Children.

We give great deference to a trial court's credibility determinations. As our Supreme Court has instructed:

> When credibility and weight to be given testimony are involved, considerable deference must be afforded to the trial court when the trial judge had the opportunity to observe the witnesses' demeanor and to hear in-court testimony. *Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997) (quoting *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996)). Because trial courts are able to observe the witnesses, assess their demeanor, and evaluate other indicators of credibility, an assessment of credibility will not be overturned on appeal absent clear and convincing evidence to the contrary. *Wells v. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

*Hughes v. Metro. Gov't of Nashville and Davidson County*, 340 S.W.3d 352, 360 (Tenn. 2011).

We will not overturn the Juvenile Court's assessment of Mother's lack of credibility. As the evidence does not preponderate against the findings made by the Juvenile Court by clear and convincing evidence, we find no error in the Juvenile Court's finding and holding that grounds existed to terminate Mother's parental rights to the Children pursuant to Tenn. Code Ann. § 36-1-113(g)(1) for willful failure to provide support.

We next consider whether the Juvenile Court erred in finding and holding that clear and convincing evidence existed to terminate Mother's parental rights to the Children pursuant to Tenn. Code Ann. § 36-1-113(g)(3) for persistent conditions. In pertinent part, Tenn. Code Ann. § 36-1-113(g)(3) provides that termination of parental rights may be based upon the grounds that:

> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to

further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

Tenn. Code Ann. § 36-1-113(g)(3) (2010).

In her brief on appeal, Mother states that Ms. Hatcher, Sierra's therapist, testified that Mother was mostly "on task" with therapy and that Mother's progress was "moderate and more than minimal." Further, Mother states that Ms. Hatcher could not conclusively state that reunification between Mother and Sierra within six months was not possible. While it is true that Ms. Hatcher did make these statements during her testimony, Mother ignores the other testimony given by Ms. Hatcher, and the testimony given by numerous other therapists and mental health professionals, in addition to the other evidence in the record, as discussed more fully above.

The Juvenile Court found and held that DCS had proven by clear and convincing evidence that grounds existed to terminate Mother's parental rights to the Children pursuant to Tenn. Code Ann. § 36-1-113(g)(3) for persistent conditions. A careful and thorough review of the record reveals that the evidence does not preponderate against these findings. As such, we find no error in the Juvenile Court's finding and holding that clear and convincing evidence existed to terminate Mother's parental rights to the Children pursuant to Tenn. Code Ann. § 36-1-113(g)(3) for persistent conditions.

Finally, we consider whether the Juvenile Court erred in finding by clear and convincing evidence that it was in the Children's best interest for Mother's parental rights to be terminated. As pertinent to this issue, Tenn. Code Ann. § 36-1-113(i) provides:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment

after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (2010).

The Juvenile Court considered all the relevant statutory factors and made very specific and detailed findings with regard to the best interest analysis. The evidence in the record does not preponderate against these findings. We find no error in the Juvenile Court's finding and holding that clear and convincing evidence was proven that it was in the best interest of the Children for Mother's parental rights to be terminated.

## Conclusion

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the appellant, Susan M.M., and her surety, if any.

_____
D. MICHAEL SWINEY, JUDGE